**Roy E. GOKEY, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 91A04–8703–CR–82.

Court of Appeals of Indiana, Fourth District.

July 21, 1987.

Robert H. Little, Brookston, for appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

CONOVER, Presiding Judge.

Defendant-Appellant Roy E. Gokey (Gokey) appeals his conviction for operating a motor vehicle with a blood alcohol content greater than .10 percent which resulted in

the death of another person, a class C felony.

We affirm.

ISSUES

Gokey presents five issues for our review. We restate them as four, namely,

1. whether the trial court erred in admitting evidence of Gokey's blood alcohol content;

2. whether the trial court erred in permitting the State to question Gokey about his alcoholism;

3. whether the trial court erred by refusing Gokey's tendered instruction on prima facie evidence of intoxication; and

4. whether the evidence established a causal connection between Gokey's driving with a blood alcohol content greater than .10 percent and the death of the victim.

ISSUES

On February 16, 1986, Gokey was driving northbound on a rural White County road. The road was icy. As Gokey approached an oncoming car he applied his brakes. His car then began to spin. Gokey's car crossed the center line and struck the approaching car being driven by Candy Tiede. Tiede died from the injuries she sustained in the accident. Gokey was taken to the hospital for treatment of cuts. At the hospital, a police officer noticed the smell of alcohol on Gokey's breath and asked him to take a breathalyzer test. It revealed a blood alcohol content of 0.16 percent.

At a trial by jury, Gokey was convicted of vehicular homicide and sentenced to a term of eight years. He appeals.

DISCUSSION AND DECISION

Gokey argues the trial court erred in admitting the results of the breathalyzer test because a proper foundation was lacking. We disagree.

There are three foundational requirements for admission of breath test results which must be established:

(1) The operator administering the test was certified by the department of toxicology;

(2) The equipment used in the test was inspected and approved by the department of toxicology; and

(3) The operator followed procedures approved by the department of toxicology.

*Sell v. State* (1986), Ind.App., 496 N.E.2d 799, 801.

The State entered letters into evidence certifying Officer James Reynolds (Reynolds) was qualified to administer the test and the breathalyzer machine had been properly inspected and approved.

Gokey argues the State failed to prove the third element of the foundational requirements. Specifically, Gokey argues the State failed to prove what the required procedures were as approved by the Department of Toxicology at the Indiana University School of Medicine.

IND.CODE 9–11–4–5 provides in part breathalyzer results are not admissible into evidence unless administered in accordance with the procedures set out by the director of the department of toxicology at Indiana University.

Our appellate courts have consistently maintained the foundation for entering breath test results into evidence requires proof these approved procedures have been followed. *See Boothe v. State* (1982), Ind. App., 439 N.E.2d 708; *Hartman v. State* (1980), Ind.App., 401 N.E.2d 723.

Gokey contends a copy of the procedures must be entered into evidence or the procedures must be read into the record.

The approved procedure for administering a breathalyzer test is set out in 260 IAC 1.1–4–4

260 IAC 1.1–4–4 Intoxilyzer 5000 test method

Authority: IC 9–11–4–5

Affected: IC 9–11–4–5

Sec. 4. The following is the approved method to conduct an Intoxilyzer 5000 test for alcoholic intoxication:

(1) The person to be tested must have had nothing to eat or drink, must not have put any foreign substance in his/her mouth or respiratory tract, and

must not smoke within twenty (20) minutes prior to the time a breath sample is taken.

(2) Power switch must be in the ON position. Depress the START TEST button when indicated on the LED screen.

(3) Fill in a PRINT RECORD card with the appropriate information and place it in the PRINTER SLOT.

(4) When instrument displays "Please Blow", attach a new mouthpiece to the BREATH TUBE and instruct the subject to deliver his breath sample until the audible signal stops.

(5) Check the PRINT RECORD to be sure it is correct.

(6) If a failure to provide an adequate breath sample was caused by the lack of cooperation by the subject, the operator should record that the test was refused.

*(State Department of Toxicology; 260 IAC 1.1-4-4; filed Dec 13, 1983, 10:56 am: 7 IR 339; errata, 7 IR 389; filed Dec 19, 1985, 3:37 pm: 9 IR 1296; errata, 9 IR 2063)*

Here, the testimony between the State and Officer Reynolds was,

Q. Officer Reynolds, prior to administering the breath test through the Intoxilyzer 5000, to the Defendant, did you follow the approved methods promulgated by the Department of Toxicology?

A. Yes, I did.

Q. In particular, did you ascertain that the Defendant did not have anything to eat, drink or place any foreign substance in his blood or respiratory tract, twenty minutes prior to the taking of the breath sample?

A. Yes, I did.

Q. Prior to the test, did you make sure that the power switch on the Intoxilyzer 5000 was in the "on" position?

A. Yes.

Q. And was it in the "on" position?

A. Yes.

Q. Did you depress the "start test" button when indicated on the LED screen?

A. Yes.

Q. And is the LED screen part of the Intoxilyzer 5000?

A. Yes.

Q. Did you then fill any print record with the appropriate information and place it in the printer slot on the machine?

A. Yes.

Q. Did you then attach a new mouth piece to the breath tube when the instrument displayed the "please blow" sign and instruct the subject to deliver a breath sample until the audible signal stopped?

A. Yes.

Q. Did the subject deliver a breath sample through the audible signal?

A. Yes.

Q. And did the audible signal stop?

A. Yes.

Q. Did the machine then activate?

A. Yes.

Q. And was a result given?

A. Yes.

Q. After the result was given—

MR. SANDY: Your Honor, excuse me, I realize this is foundation, but I'm going to object to the leading nature of the questions, I think he can ask—

THE COURT: Objection is overruled.

Q. After the result was given, did you than check the print record to make sure it was correct?

A. Yes.

Q. Was the print record correct?

A. The print record? I found out the time was off.

Q. Okay, and was that the only thing that was wrong?

A. Yes.

Q. And when you say the time was off, what do you mean.

A. The time on the card had military time of 1422.

Q. What time would that be in layman times?

A. 2:20. 22.

Q. What time was the test actually administered?

A. 1:22 I believe, or 1:20 something like that—(indiscernible).

(R. 185–188).

It is clear from this testimony, the officer followed the procedures set out in 260 IAC 1.1–4–4.

█ In *Sell* the officer administering the test read the procedures into the record. Here the State read the procedures into the record in the form of foundational questions. We view the two as equivalent. We find a proper foundation was layed so as to allow the admission of the breathalyzer test into evidence.

When as here the State lays a foundation for a breath test by repeating the required language from the approved procedures in the form of questions designed to elicit testimony showing compliance with the approved procedures, no error is committed in admitting the test results.

Gokey also contends the officer administering the test did not follow the proper procedures. This contention stems from Gokey's assertion he smoked a cigarette within 20 minutes of taking the test. Officer Reynolds testified Gokey did not smoke within 20 minutes of the test. Furthermore, evidence was presented from which it could be inferred he did not smoke. We will not reweigh this evidence.

Gokey argues the trial court erred in allowing the State to cross-examine him about his alcoholism. We disagree.

Evidence is relevant if it is material to an issue in a case, tends to make a desirable inference more probable, and, in light of general experience, logically tends to prove or disprove some issue of fact. *Boyd v. State* (1986), Ind., 494 N.E.2d 284. Whether to admit evidence in a criminal proceeding is within the discretion of the trial court, and it is afforded wide latitude in ruling on the relevancy of evidence. *McGee v. State* (1986), Ind., 495 N.E.2d 537. The trial court abuses its discretion in such cases only where there is a clear showing of imbalance between the relevancy of offered evidence and the unduly tendency to prejudice the jury. Only then is such evidence inadmissible. *Eddy v. State* (1986),

Ind., 496 N.E.2d 24; *Chittenden v. State* (1982), Ind., 436 N.E.2d 86 (photographic evidence).

Gokey argues the evidence in question was used only to prejudice him in the eyes of the jury. The State argues such showing was part of its evidence proving an alcoholic would not show the effects of a high blood alcohol content as much as a nonalcoholic.

█ Gokey tried to impeach the validity of the breathalyzer results by claiming no one noticed any actions on his part which led anyone to believe he was drunk at the time of the accident. A State's witness testified without objection an alcoholic would not show the effects of a high blood alcohol content as would a nonalcoholic. Therefore, whether Gokey was an alcoholic is relevant to how he would act with a high blood alcohol level.

█ Unlike the cases cited by Gokey in support of his argument the State did not question him concerning prior uncharged criminal actions or prior uncharged alcohol related convictions. *See Smith v. State* (1983), Ind.App., 451 N.E.2d 57. Furthermore, the State did not use the evidence to impeach Gokey's credibility. Accordingly, the relevancy of the evidence was not outweighed by the prejudice it might have caused. *Eddy* and *Chittenden, supra.*

Gokey next argues the trial court erred in refusing to give his tendered instruction on prima facie evidence of intoxication.

The test of whether a tendered instruction is proper is whether there is evidence to support giving the instruction, whether the substance of the instruction is covered in other instructions and whether the instruction properly states the law. *Bieghler v. State* (1985), Ind., 481 N.E.2d 78, 96; cert. denied (1986), —— U.S. ——, 106 S.Ct. 1241, 89 L.Ed.2d 349. Moreover, the giving of instructions lies largely within the discretion of the trial court. *Id.*

Gokey's tendered instruction was

In Indiana, there were in effect at the time of the alleged offense, the following laws:

1. Evidence that at the time of an alleged violation that there was ten/hundredths percent (.10%), or more, by weight of alcohol in a person's blood is prima-facie evidence of intoxication.

2. Intoxicated means under the influence of:

(1) alcohol;

(2) a controlled substance;

(3) any drug other than alcohol or a controlled substance; or

(4) any combination of alcohol, controlled substance, or drugs, such that there is an impaired condition of thought and action and loss of normal control of a person's faculties to such an extent as to endanger other persons.

■ Gokey was not charged with intoxication, instead he was charged with having a blood alcohol content greater than .10 percent. Thus, the instruction was extraneous to the case and is properly excludable. *Rogers v. State* (1979), 272 Ind. 65, 396 N.E.2d 348.

Gokey claims the instruction was important to prove the breathalyzer test was inaccurate because no one testified he acted drunk at the scene. Such back door logic is the type of confusion which the trial judge should try to avoid. *Woods v. State* (1985), Ind., 484 N.E.2d 3. Accordingly, the trial court did not err in not giving the instruction.

Gokey contends there was not sufficient evidence to establish a causal connection between his driving with a blood alcohol content greater than .10 percent and Tiede's death.

At the outset, we emphasize this court does not reweigh the evidence or reassess the credibility of witnesses. *Freeman v. State* (1985), Ind.App., 482 N.E.2d 266.

Gokey admits "the state simply must show that the defendant caused the accident," *Smith v. State* (1986), Ind.App., 496 N.E.2d 778, 780.

Our Supreme Court addressed this issue in *Micinski v. State* (1986), Ind., 487 N.E.2d 150, 154:

This is not to say that a drunk driver who hits a child who has run out from between two parked cars is not entitled to ask a jury to find him not guilty because there is reasonable doubt whether he caused the collision. In fact, Micinski has made a similar argument: he asserts that the proof showed the fog and the victims may have caused the collision. The jury heard this argument and the evidence and found Micinski guilty. Our review of the evidence indicates they were entitled to do so.

■ Here, the jury heard the evidence concerning causation. The State presented evidence Gokey was driving with a blood alcohol content of over .30 percent at the time of the accident. Gokey spun on the road and crossed its center line. The jury was entitled to find Gokey had driven under the influence of alcohol and Tiede's death was caused thereby.

We affirm.

MILLER, J., concurs.

SULLIVAN, J., concurs in result.